UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBORAH R. RICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:11-CV-1961 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On February 17, 2009, plaintiff Deborah R. Rice protectively filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title VI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 23, 2007. (Tr. 151, 134-41). After plaintiff's applications were denied on initial consideration (Tr. 66-68, 71-75), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 78-84).

Plaintiff and counsel appeared for a hearing on April 7, 2010. (Tr. 37-65). The ALJ issued a decision denying plaintiff's application on June 23, 2010. (Tr. 15-32). The Appeals Council denied plaintiff's request for review on October 4, 2011. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 160-69), plaintiff listed her disabling conditions as depression, and problems with her hands, arms, knees, back, and neck. She stated

that she could not stand for long periods or climb stairs due to pain in her knee. She complained of pain in her right arm that radiated into her neck and back and stated that she had developed pain in her left side as a result of trying not to overuse her right side. Numbness in her hand and elbow kept her from sleeping well. On occasion, she had a stiff neck that lasted for several weeks. She had last worked on the assembly line at an automobile assembly plant. She was prescribed Ibuprofen and Naproxen for pain, Fluoxetine and Buproprion for depression, and Trazadone as a sleep aid. Her medications caused her to feel drowsy and lightheaded. (Tr. 195).

Plaintiff completed a Function Report on March 21, 2009. (Tr. 171-80). In response to a question regarding her average daily activities, plaintiff wrote that she showered, ate, read, and watched television. She occasionally did a small amount of cleaning. Some days, she woke up in pain and stayed in bed and cried. She stated that she felt a stabbing pain in her neck, back, and shoulder and that it was painful to lift a glass of water. She had difficulty combing her hair and completing her hygiene. She usually prepared sandwiches and frozen meals for herself; family members brought her meals as well. She no longer cooked for herself more often than once every week or two because she could not lift pots and pans and was worried about dropping something hot. She stated that she did light cleaning and laundry. She went out two or three times a week. She was able to drive unless she was in pain. She shopped once every three weeks. She was able to pay bills, manage a checkbook, and count change. Plaintiff played slot machines about three times a month and attended church twice a month. She had difficulties with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, completing tasks, concentrating, using her hands, and getting along with others. She could walk half a block before she needed

-2-

to rest for about 5 minutes. When she was pain-free, she could follow instructions very well. However, she did not handle stress or changes in routine well.

## B. Hearing on April 7, 2010

Plaintiff was 52 years old at the time of the hearing. She left school in the eleventh grade and had not obtained a GED. (Tr. 39).

Plaintiff testified that she worked on the assembly line at General Motors from 1996 to December 2007, when the plant closed for Christmas. Despite four surgical procedures and large doses of Ibuprofen, she had problems with her arm, back, and knee, and was unable to keep up on the line. She stated that she was afraid she would be fired and, in June 2008, she accepted the company's buyout offer, for which she received $70,000. (Tr. 40). She also received $48,934.05 in settlement of her worker's compensation claims that year. (Tr. 22).

Plaintiff testified that she had arthritis in her right hand, elbow, and shoulder. The pain started in her right fingers and went all the way up her arm and across her shoulder. (Tr. 46). Her right shoulder ached across her back and into her neck; occasionally the pain caused headaches. (Tr. 45). She often experienced a sharp pain with movement; she also complained of tingling and numbness. Her right elbow was numb and she was unable to rest it on a surface. She often dropped things and was afraid to cook. She had been using her left hand more but it had begun to hurt as much as her right hand, and she was developing tennis elbow and carpal tunnel syndrome in her left arm. She also complained of muscle spasms in her left shoulder. She had difficulty reaching above shoulder height. Plaintiff's back pain made it difficult for her to climb stairs and she could not sit, stand or walk for very long. Occasionally, she was unable to turn her head from one side to the other. Her right knee was prone

-3-

to swelling and stiffness, making it difficult for her to squat or bend. She sometimes wore a brace on her knee, but she thought it made the swelling worse. She suffered from migraine headaches that might last as long as four days or a week. While Naproxen provided some relief, she was never pain-free. She testified that she was no longer able to bowl or play darts.

Plaintiff was being treated for depression and anxiety attacks. She sometimes had anxiety attacks while driving and had to call her sisters to pick her up. She testified that she sometimes acted mean or moody and so she preferred to avoid other people. When asked whether there were times when she did not get out of bed or leave the house, she replied "[w]eeks at a time." (Tr. 48). She explained that there are days when she wakes up and feels like she is "just ready to end it all" because she is tired of "the pain and suffering of depression." She testified that she experienced nightmares, especially about family members who had died in recent years. She was no longer able to concentrate enough to read and had difficulty with her memory.

When asked why she had not sought work, plaintiff testified that she was in pain a lot, she dropped things, and she was seeing a psychiatrist and counselor. She had tried babysitting, but could not "deal with the kids." After surgery on her right elbow and shoulder, she was released to work with a restriction on lifting more than 30 pounds. Plaintiff acknowledged that no treating physician had changed that restriction. (Tr. 42). Plaintiff confirmed that she smoked marijuana. She testified that it helped her to sleep when she was unable to obtain her medication. When asked about the frequency of her use, she stated that she had smoked twice in a little more than a week. She also confirmed that she consumed four or five alcoholic beverages a week. (Tr. 43).

-4-

Malcom J. Brodzinsky, M.A., a vocational expert, provided testimony regarding the employment opportunities for an individual with plaintiff's education, training and work experience, with the ability to lift and carry 20 pounds occasionally, and 10 pounds frequently; stand, walk and sit for 6 hours out of 8; occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl; and with restrictions on overhead reaching. In addition, the hypothetical individual had the ability to understand, remember and carry out simple instructions and non-detailed tasks; had adequate judgment to make simple work-related decisions; was able to respond appropriately to supervisors and co-workers; and could adapt to routine simple work changes. Mr. Brodzinsky opined that such an individual would not be able to perform plaintiff's past relevant work but could work as a small parts assembler, small products assembler, or ticket seller. Mr. Brodzinsky was next asked to assume that the individual was extremely restricted in the areas of understanding, remembering and carrying out detailed instructions; interacting appropriately with the public, co-workers, and supervisors; and responding appropriately to work pressures and changes in the work setting. He testified that such an individual would be precluded from working. (Tr. 59).

Plaintiff's counsel also posed hypothetical questions to the vocational expert. She first asked him to assume that the individual was limited to lifting 15 pounds occasionally and 10 pounds frequently, and thus was capable of only sedentary work. Mr. Brodzinsky opined that these limitations would not preclude the individual from performing work as a small parts assembler or ticket seller, even though these jobs are classified as light work by the Dictionary of Occupational Titles (DOT). He explained that the exertion classification for these positions was a function of the amount of

standing and walking required. He stated that many assembler and ticket seller jobs were actually performed at the sedentary level. (Tr. 60-61). In the next hypothetical, counsel asked Mr. Brodzinsky to assume that the individual could lift 10 pounds occasionally, walk or stand 2 hours out of 8, sit for 6 hours out of 8, and could reach occasionally. He responded that an individual with these limitations would be precluded from work. (Tr. 63-64).

### C. Medical Evidence

On November 29, 2005, William G. Sedgwick, M.D., diagnosed plaintiff with epicondylitis and early cubital tunnel syndrome[1] in the right elbow. (Tr. 585). On February 27, 2006, Dr. Sedgwick performed an ulnar nerve transposition and tennis elbow repair. (Tr. 219-20). During a course of post-operative physical therapy, plaintiff began to complain of pain in her right shoulder. (Tr. 230-35). On August 8, 2006, Dr. Segwick performed surgery on plaintiff's right shoulder to treat impingement and arthrosis of the acromioclavicular joint. (Tr. 214-15). Plaintiff went to physical therapy which improved the shoulder's strength and range of motion, as well as her ability to perform daily activities. (Tr. 247-49, 252-54). Plaintiff continued to be limited in her ability to reach across her body or behind her back. (Tr. 252-54).

Plaintiff's primary care physician referred her for a psychiatric evaluation of depression. (Tr. 415). On April 17, 2007, plaintiff saw Aqeeb Ahmad, M.D. (Tr. 386-88). She reported that she feared dying and had panic attacks. She cried a lot and

---

[1]Lateral and medial epicondylitis (tennis elbow and golfer's elbow, respectively) are the result of inflammation of tendons in the elbow. http://www.webmd.com/pain-management/guide/elbow-pain (last visited Nov. 29, 2012). Cubital tunnel syndrome is a nerve entrapment syndrome involving the ulnar nerve. http://www.webmd.com/a-to-z-guides/pinched-nerve-in-or-near-the-elbow-topic-overview (last visited Nov. 29, 2012).

-6-

had difficulty concentrating.   On mental status examination, plaintiff exhibited a depressed mood with dysphoric and anxious affect.  She was tearful and had slowed motor responses.  Dr. Ahmad diagnosed plaintiff with major depression with a Global Assessment of Functioning (GAF) score of 45,[2] and prescribed Fluoxetine and Ambien. The record contains notes of seven additional sessions between April and August 2007. (Tr. 374-89).  Throughout that time, plaintiff continued to present with panic attacks and crying.  On May 4, 2007, Dr. Ahmad increased the dosage of Fluoxetine and added Xanax.  (Tr. 384).  On June 13 and June 27, 2007, Dr. Ahmad assigned plaintiff a GAF score of 59. (Tr. 381-82).  On August 20, 2007, plaintiff was started on Cymbalta; her GAF was 55.  (Tr. 380).  At the following visit on August 28, 2007, plaintiff was depressed, worried, anxious and tearful.  She reported that she was in constant pain and could not properly do her job because she fell behind on the assembly line.  Her GAF on that day was 50.  (Tr. 379).

On August 1, 2007, Shawn L. Berkin, D.O., completed an independent medical examination with respect to occupational injuries to plaintiff's right arm and knee.  (Tr. 303-17).  On examination, Dr. Berkin noted slight muscle wasting but no instability in either shoulder joint.  The drop-arm test was negative while an impingement test was positive. Plaintiff experienced pain during range of motion testing of the shoulder.  She had full range of motion of the right elbow.  Tinel's sign was present at the elbow and hand and her grip strength was lower on the right than left.  Her station and gait were normal.  She had a normal lumbar curve with midline tenderness over lumbar column.

---

[2]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning."   American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Straight leg raising was positive on the left.  The Patrick (FABER) test[3] was negative bilaterally.  Plaintiff's right knee showed no instability, swelling or effusion, and tests for tears or ruptures in the knee were negative.  Her reflexes were normal.  She experienced pain on range of motion testing and was unable to squat.

Dr. Berkin opined that plaintiff had a 20% permanent partial disability of the body as a whole at the level of the cervical spine; a 35% permanent partial disability of the upper right extremity at the level of the shoulder; a 50% permanent partial disability of the right upper extremity at the level of the elbow; a 15% permanent partial disability of the left upper extremity at the level of the shoulder; and a 15% permanent partial disability of the right lower extremity at the knee.  He recommended the use of nonsteroidal anti-inflammatory medication and participation in a home exercise program to strengthen and improve the mobility of her neck, arms, and knee.  He imposed a 35-pound lifting restriction on an occasional basis with a 25-pound limit on frequent lifting.  He instructed plaintiff to avoid holding her neck in a fixed position for a long period and rapid or extreme neck movements.  He further opined that she should avoid lifting with her arms extended from her body or excessive lifting or working above shoulder level.  She should also avoid excessive squatting, kneeling, stooping, turning, twisting, and climbing.  Finally, Dr. Berkin indicated that plaintiff required frequent breaks during periods of extended exertion.

On December 7, 2007, plaintiff was diagnosed with osteoarthritis in the right knee.  (Tr. 333).

---

[3]The Patrick (FABER) test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine and sacroiliac region. http://www.physio-pedia.com/FABER_Test (last visited on Nov. 29, 2012).

On February 19, 2008, Dr. Sedgwick also completed an evaluation with respect to plaintiff's occupational injuries. (Tr. 346-49). On examination, plaintiff had full range of motion of the right shoulder with some discomfort; impingement signs were negative. Her right knee showed some crepitus without effusion or tenderness. Dr. Sedgwick's impression was status post surgery at the right elbow and shoulder, arthrosis patellofemoral articulations, and slight disc bulging from C3 through C7. He opined that plaintiff sustained 15% permanent residual disability of the right upper extremity at the level of the elbow, an additional 10% permanent residual disability of the upper right extremity at the level of the shoulder, and a 2% permanent residual disability of the body as a whole at the level of the cervical spine. She had no residual disability at the right knee.

On June 16, 2009, Saul Silvermintz, M.D., completed a consultative examination. (Tr. 424-31). Plaintiff complained of persistent pain in her hands, arms, knees, back, and neck. Both sitting and standing made the pain in her back worse. She had trouble making a fist and dropped things. On examination, Dr. Silvermintz noted limitations in range of motion in her neck and both shoulders. Plaintiff had no edema or swelling. Her gait was normal and she was able to get on and off the examination table without difficulty. Dr. Silvermintz opined that plaintiff had degenerative disc disease with pain, and was status post surgery of the right shoulder and elbow, resulting in limitations in the range of motion of her right arm.

Also on June 16, 2009, L. Lynn Mades, Ph.D., completed a consultative psychological evaluation. (Tr. 434-38). Plaintiff reported that she experienced significant stress arising from the deaths since 2003 of her mother, her father, a sister and a nephew. Her symptoms included weight gain, sleep problems, difficulty with

concentrating and remembering; not wanting to be bothered by others; and crying a lot. She was irritable. She had four alcoholic drinks a week and occasionally used marijuana. Dr. Mades described plaintiff as displaying a "generally cooperative" and pleasant attitude, with an alert expression and fair eye contact. Her motor activity was "mildly tense" and agitated. Her speech was spontaneous, coherent, relevant, and logical. Her mood was depressed and her affect, though generally appropriate, was restricted. There was no evidence of a thought disturbance. She could repeat 6 digits forward and could name the president, but not the governor or mayor. Her insight and judgment were fair. She displayed adequate attention and concentration, with appropriate persistence and pace. With respect to her activities of daily living, plaintiff reported that she lived alone. She handled few household chores, sometimes cooking or fixing her bed. She was able to drive. Her activities included going to a casino, watching television, and reading. She reported that she got along "adequately" with others, but also reported increased irritability and decreased sociability. Dr. Mades diagnosed plaintiff with major depressive disorder, single episode, mild, with a rule-out diagnosis of cannabis abuse. She assigned plaintiff a GAF of 65.[4]

On July 8, 2009, Shirley A. Marshall, M.D., completed an initial primary care visit with plaintiff. (Tr. 537-38). Plaintiff complained of pain in her right arm, which she rated at level 5 on a 10-point scale. On examination, Dr. Marshall noted that there was no redness, swelling, atrophy, myalgia or swelling of extremities. Plaintiff displayed normal posture. The right knee showed minimal crepitus without

---

[4]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

tenderness, laxity or effusion. She had mild pain on movement of the right elbow and showed discomfort when lifting her arm above her head. X-rays of the right shoulder and elbow were negative, while an x-ray of the right knee revealed mild osteoarthritis. (Tr. 544-46).

Dr. Marshall referred plaintiff for evaluation for mental health services. On July 8, 2009, plaintiff met with Doris King, M.S.W. (Tr. 536). Plaintiff reported feeling "stressed out" and depressed over pain and financial circumstances. She reported that she planned to start a day-care service in her home because she could no longer work on the assembly line. She had been depressed for some years, starting in adolescence. Recently, she stayed in bed and cried and tended to isolate herself more. She enjoyed eating out but did this less frequently because of her finances and her mood. She attended church, which she found helpful. Ms. King gave plaintiff a referral to a counseling program. The record contains notes of counseling sessions between November 2009 and January 2010. (Tr. 505-07; 513, 516, 520, 522).

On July 20, 2009, Robert Cottone, Ph.D., completed a Psychiatric Review Technique form. (Tr. 439-49). Based upon his review of the record, Dr. Cottone determined that plaintiff had a depressive disorder that did not rise to the level of a severe impairment. He opined that she had mild restrictions in the activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. Plaintiff had had one or two episodes of decompensation. In a narrative section, Dr. Cottone noted that plaintiff's application did not list any treatment for depression and she had last seen her psychiatrist Dr. Ahmad on April 1, 2008. At that time, she rated her depression at level 4 or 5 on a 10-point scale. Dr. Cottone also noted that, on June 16, 2009, Dr. Mades diagnosed plaintiff with major

-11-

depressive disorder, single episode, mild.  Statements plaintiff made in her Function Report established that she lived alone and functioned without reminders.  She was capable of fixing simple meals, managing money, shopping for basic needs, and driving a car.  Dr. Cottone opined, "This is a mild depressive [disorder].  She would  be limited moderately socially and [maintaining concentration, persistence, and pace] at worst."

Dr. Cottone also completed a Mental Residual Functional Capacity Assessment. (Tr. 450-52).  He indicated that plaintiff had marked limitations in the abilities to understand, remember and carry out detailed instructions; moderate limitations in the abilities to maintain attention and concentration for extended periods and to work in coordination with or proximity to others without being distracted.  Dr. Cottone also indicated that plaintiff had moderate limitations in the abilities to complete a normal workday and workweek without interruption from psychologically based symptoms; to perform at a persistent pace without an unreasonable number and length of rest periods; to interact appropriately with the public and coworkers; and to accept instruction and respond to criticism.  There was no evidence of any limitation in her ability to sustain an ordinary routine without special supervision.

Marsha Muckermann-McCall, D.O., completed a Physical Residual Functioning Capacity Assessment (PRFCA) on July 20, 2009 (Tr. 453-59).  Based on a review of the medical records, Dr. McCall determined that plaintiff was able to frequently lift and/or carry 10 pounds, and occasionally lift and/or carry 15 pounds.  She was able to sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling.  She had limited capacity to reach, including overhead, and should avoid vibration and hazards.  Dr. McCall noted that Dr. Berkin imposed greater restrictions in 2007 than Dr. Sedgwick did in 2008, and that in June 2009, Dr. Silvermintz reported

that plaintiff displayed a normal gait and was able to move around the room well. In addition, she had full grip strength, with no weakness in her extremities or difficulty with fine finger movements. She demonstrated limited range of motion of her right arm.

Plaintiff was seen by William Feldner, D.O., for evaluation of her right shoulder and knee pain on July 30, 2009. (Tr. 530-31). On examination of plaintiff's shoulder, Dr. Feldner noted mild tenderness on palpation and some creaking. There was no swelling. Range of motion testing was limited due to guarding and pain. Drop-arm and empty-can tests were negative, as were tests of instability. With respect to plaintiff's elbow, there was no pain or tenderness to palpation. Dr. Feldner noted normal strength and tone, normal range of motion, normal reflexes, and normal carrying angle. Plaintiff's knee was moderately tender on palpation, but there was no evidence of swelling or effusion. A test for instability of the knee joint was negative, while the anterior patellar grind test and a test for meniscal tear were positive. Dr. Feldner opined that plaintiff's shoulder pain might be cervical in origin, whereas the pain in her knee was due to osteoarthritis. He recommended to plaintiff that she maintain strength and flexibility, lose weight, and continue to take Naprosyn. He instructed her on the use of ice and resting and gave her exercises to do on her own. He counseled her to have "realistic expectations" of her prescriptions. He did not impose any limitations on her activities.

In December 2009, plaintiff told Dr. Marshall that the Naprosyn was effective about 80% of the time. (Tr. 517).

On January 4, 2010, Richa Bhatia, M.D., completed a psychiatric evaluation of plaintiff, on referral from Dr. Marshall. (Tr. 496-99). Plaintiff reported that she had

-13-

difficulty dealing with the loss of her family members and was feeling stress over her finances. She reported a desire to "not be here" and was isolating herself from others. Dr. Bhatia noted that plaintiff endorsed signs of anhedonia, hopelessness, and worthlessness. Plaintiff reported that she had difficulty focusing and that her energy level was poor. She was seeing a counselor once a week. Dr. Bhatia described plaintiff as calm, pleasant, and cooperative, with good eye contact and depressed mood. Her affect was tearful at times, but otherwise was restricted. Her thought processes were logical and her memory was intact. Dr. Bhatia opined that plaintiff's impulse control, insight, judgment and intelligence were fair. Dr. Bhatia diagnosed plaintiff with major depressive disorder, with rule-out diagnoses of dysthymia and general anxiety disorder, and assigned a GAF rating of 55. Plaintiff's dosages for Fluoxetine and Trazadone were increased.

On February 22, 2010, plaintiff reported to Dr. Bhatia that she sometimes heard the doorbell ringing when no one is there. (Tr. 495). She stated that she was afraid to cook due to the pain in her right arm and left elbow. She had no energy some days and felt helpless and hopeless. Nonetheless, she felt that the medications were helpful and she was less tearful. She indicated that the pain in her arm was her worst problem and that she sometimes felt like cutting off the arm. Plaintiff appeared cooperative, goal-directed and logical, with spontaneous and responsive speech. Dr. Bhatia's assessment was that plaintiff's mild to moderate depressive symptoms persisted but showed improvement. Dr. Bhatia did not record a GAF score at this session.

Dr. Bhatia completed a Medical Source Statement on March 8, 2010. (Tr. 490-92). Dr. Bhatia indicated that plaintiff suffered from severe anxiety, depressive

-14-

symptoms, and panic attacks.  As a result of these conditions, plaintiff had extreme restrictions in her ability to understand, remember, and carry out detailed instructions; and marked restrictions in her ability to make judgments on simple work-related decisions.  She also had extreme restrictions in her abilities to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to work pressures and changes in a routine work setting.  Dr. Bhatia did not believe that plaintiff could manage her benefits in her own interest.

On March 22, 2010, plaintiff reported to Dr. Bhatia that she was feeling more sad. (Tr. 494).  She had crying spells, low energy and a poor appetite, and wished that she were dead.  She was only sporadically taking her medication and her sleep patterns were disrupted.  On June 7, 2010, plaintiff reported to Dr. Bhatia that her depressive symptoms had improved with medication, but sad days still outnumbered happy ones.  She attributed her unhappiness to her financial situation.  (Tr. 654).

Plaintiff was evaluated by Robert P. Poetz, D.O., on March 23, 2010.  (Tr. 635-41).  On examination, Dr. Poetz noted that plaintiff ambulated with a normal gait.  She had decreased range of motion of her right elbow and both shoulders, more so on the right side.  Her grip strength was decreased on the right side.  She had crepitus in the right knee.  Her cervical spine displayed decreased range of motion.  Straight leg raising was negative and there were no radicular signs.  Dr. Poetz diagnosed plaintiff with right lateral epicondylitis and cubital tunnel syndrome, status post right anterior ulnar nerve transposition and epicondylectomy; right shoulder impingement syndrome with symptomatic arthrosis of the acromioclavicular joint, status post acromioplasty and excision of the clavicle; left shoulder impingement syndrome; cervical spondylosis and bulging disc at C3-4 through C6-7, most pronounced at C5-6; right knee

-15-

patellofemoral pain and degenerative joint disease; chronic low back pain; right carpal tunnel syndrome; and major depression. He recommended that plaintiff avoid heavy lifting, strenuous activity, prolonged sitting, standing, walking, stooping, bending, squatting, twisting and climbing. She should also avoid excessive and repetitive use of her upper extremities and avoid using equipment that creates torque, vibration or impact to the upper extremities. She should avoid stressful situations. Dr. Poetz opined that plaintiff was "unable to maintain gainful employment due to her multiple health and orthopedic conditions." In his a medical source statement, he opined that plaintiff had the ability to carry less than 10 pounds; stand or walk for up to 2 hours in an 8 hour day; and sit for up to 6 hours. She had limited capacity to push or pull using her arms and was restricted to occasional reaching. (Tr. 643-45).

On June 7, 2010, Dr. Bhatia noted that plaintiff's depressive symptoms had improved but were not completely resolved. (Tr. 654).

### III. The ALJ's Decision

In the decision issued on June 23, 2010, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since December 23, 2007, the alleged onset date.

3. Plaintiff has the following severe impairments: mild to moderate depression, obesity, degenerative changes of the right knee, degenerative disc disease of the neck, and residuals of right shoulder and elbow surgery.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work, except that she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand or walk for a total of 6 hours in an 8 hour

-16-

day; she can occasionally climb ramps or stairs; she should only occasionally balance, stop, kneel, crouch, or crawl; she should only occasionally perform reaching overhead on the right; she should avoid concentrated exposure to vibrations and hazards.  In addition, she can understand, remember, and carry out at least simple instructions and non-detailed tasks; she has adequate judgment to make simple work-related decisions; she can respond appropriately to supervisors and con-workers; and she can adapt to routine or simple work changes.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was closely approaching advanced age on the alleged date of onset.

8.    Plaintiff has limited education and can communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills.

10.   Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from December 23, 2007, through the date of the decision.

(Tr. 20-31).

## IV.  Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those

positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all

-18-

relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

-19-

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ made errors in determining her residual functional capacity (RFC); that the ALJ failed to clarify inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Titles; and that the ALJ improperly discounted the opinion of her treating psychiatrist.

## A. The RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the

-20-

Commissioner.  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

## Credibility

As part of his RFC analysis, the ALJ addressed plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms and concluded that they were not entirely credible.  (Tr. 27).  He noted, for example, that plaintiff's daily activities were not consistent with the degree of impairment she alleged.  She lived alone and did not report receiving help with maintaining her residence.  She was able to drive, shop, go to the casino and church, and manage her finances.  The ALJ noted that these daily activities are "fairly limited"; however, it was difficult to attribute the degree of limitation to plaintiff's medical condition.

In further support of the ALJ's credibility analysis, the defendant notes that plaintiff stopped working when the assembly plant shut down for the holidays; she thereafter accepted a $70,000 buyout and did not return to work.  See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.")  In 2008, plaintiff received unemployment compensation and, thus, had to report that she was actively seeking employment; she also told a physician that she was planning to open a home-based day-care center.  See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (seeking work while applying for disability is inconsistent with allegations of disabling pain).

In addition, plaintiff's allegations of disabling pain were not fully supported by objective medical evidence.  Thus, plaintiff alleged that she was seriously limited in her ability to stand or walk, but her gait and station were routinely noted to be normal.

-21-

(Tr. 28, 311, 323, 426, 524, 638). Neurological examinations did not indicate the presence of serious impairment. (Tr. 426). X-rays of her right shoulder and elbow were negative while an x-ray of her knee revealed mild to moderate osteoarthritis. An MRI of her spine in 2005 showed slight cervical spondylosis, with slightly bulging disc without disc extrusion. (Tr. 482). Finally, there were significant gaps in plaintiff's treatment for depression, casting doubt on her allegations of disabling symptoms as a result of the condition.

### Ability to Lift 20 Pounds

The ALJ determined that plaintiff is able to lift 20 pounds occasionally while Dr. McCall found that she was limited to lifting 15 pounds occasionally. Plaintiff essentially asserts that the ALJ should have adopted Dr. McCall's 15-pound restriction, which would limit her to performing sedentary, rather than light, work. See 20 C.F.R. § 404.1567 (sedentary work involves lifting no more than 10 pounds; light work involves lifting no more than 20 pounds). Plaintiff argues that a finding she was capable of no more than sedentary work would result in a finding of disability under the Medical-Vocational Guideline Rule 201.09. Plaintiff further argues that no physician opined that she was capable of lifting 20 pounds and that the ALJ therefore improperly drew his own inferences from the medical reports.

Plaintiff's argument fails on a factual error -- in August 2007, Dr. Shawn Berkin determined that plaintiff was able to lift up to 35 pounds occasionally and 25 pounds frequently. Thus, the ALJ's determination that plaintiff retains the RFC to lift 20 pounds occasionally is supported by evidence in the record and her argument regarding the Medical-Vocational Guidelines is moot.

### Combined Impairments

Plaintiff also argues that the combination of obesity and osteoarthritis of the right knee prevent her from standing or walking for 6 hours out of 8. The regulations direct that, where a claimant has multiple impairments, the combined effect of those impairments will be considered. 20 C.F.R. § 404.1523. The ALJ's decision reflects that he properly considered the effect of her impairments in combination and found that plaintiff's obesity, alone or in combination with her depression and musculoskeletal impairments, significantly limited her ability to do basic work activities. (Tr. 23). He nonetheless concluded that she was capable of light work.

Medical evidence in the record supports this determination. With respect to her knee, x-rays in December 2007 indicated that plaintiff had osteoarthritic changes of the right knee. (Tr. 333). In February 2008, Dr. Sedgwick found no permanent disability with respect to that knee. (Tr. 346-49). In July 2009, Dr. Feldner found that plaintiff had coarse crepitus and moderate tenderness on palpation. However, the knee was stable, without laxity or effusion. (Tr. 537-38). He made recommendations regarding proper care, including ice packs, exercises, and weight loss, but did not impose any restrictions on use of her knee. In March 2010, Dr. Poetz opined that plaintiff was limited to standing or walking 2 hours in an 8 hour day. The ALJ gave Dr. Poetz's opinion "lesser weight" because he did not have a treatment relationship with plaintiff but completed his examination at her attorney's request to support her claim for benefits. Furthermore, the ALJ noted, Dr. Poetz's opinion was inconsistent with other evidence in the record, notably the opinion of Dr. Berkin. See Tr. 29 (citing Ex. 3F, Dr. Berkin's report). With respect to plaintiff's depression, as discussed below, the ALJ's determination that this impairment did not preclude all work is also supported by substantial evidence in the record as a whole.

The Court concludes that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

### B.  Conflict Between Expert's Testimony and the DOT

Plaintiff asserts that the ALJ failed to resolve a conflict between the DOT and the testimony of Mr. Mr.  Brodzinsky, the vocational expert, regarding the proper exertional level of the jobs of small products assembler and ticket seller.

As detailed above, the ALJ asked the vocational expert whether there were jobs that could be performed by an individual of plaintiff's education, training and work experience, with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; and to stand, walk and sit for 6 hours out of 8. Mr.  Brodzinsky  identified small parts assembler, small products assembler, and ticket seller as qualifying jobs available in the national economy.  Plaintiff's counsel asked the expert to assume that the individual was limited to lifting 15 pounds occasionally and 10 pounds frequently, and thus was capable of only sedentary work.  The expert opined that these limitations would not preclude the individual from performing work as a small parts assembler or ticket seller, even though these jobs are classified as light work by the Dictionary of Occupational Titles (DOT), because many assembler and ticket seller jobs were actually performed at the sedentary level.  (Tr. 60-61).

To the extent that the vocational expert's testimony conflicts with the DOT, the disparity arose solely in response to hypothetical limitations exceeding those found by the ALJ.  Plaintiff's second allegation of error is rejected.

### C.  Treating Psychiatrist's Opinion

Plaintiff asserts that the ALJ erred in rejecting the opinion of her treating psychiatrist, Dr. Bhatia, that she was incapable of working.  The ALJ found that plaintiff

-24-

had some limitations arising from her psychiatric conditions, but he did not adopt Dr. Bhatia's opinion regarding the degree of limitation.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). The opinion of a treating source may be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2). However, the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).

"[W]hile a treating physician's opinion is generally entitled to 'substantial weight,' such an opinion does not 'automatically control' because the hearing examiner must evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (quoting Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999)). "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." Id. (quoting Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Id. There are, however, two exceptions to this rule: an ALJ may discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Id.

In this case, the ALJ noted that the limitations endorsed by Dr. Bhatia were inconsistent with her treatment notes.  Dr. Bhatia completed the medical source statement in March 2010, after seeing plaintiff twice.  At the first visit on January 4, 2010, Dr. Bhatia assessed plaintiff's GAF as 55.  This score is indicative of moderate symptoms and is inconsistent with the limitations in the medical source statement.  At the second visit on February 22, 2010, plaintiff reported that her antidepressant medication was helpful and Dr. Bhatia assessed her depressive symptoms as "mild to moderate."  This assessment is also inconsistent with the limitations in the medical source statement.  There is no GAF score recorded for that session, but it is logical to assume that it was no lower than 55.

Dr. Bhatia's assessment is also inconsistent with other evidence in the record.  On June 16, 2009, Dr. Mades determined that plaintiff's memory was intact and that she was able to maintain adequate attention and concentration with appropriate persistence and pace.  Plaintiff told Dr. Mades that she was able to get along with others adequately.  Plaintiff was spontaneous, coherent, logical and relevant, with a generally pleasant and cooperative attitude.  Dr. Mades assigned plaintiff a GAF score 65, indicating only mild symptoms.

Plaintiff cites the ALJ's statement that Dr. Bhatia did not factor in the effects of plaintiff's alcohol use and marijuana abuse.  (Tr. 29).  Plaintiff is correct that Dr. Bhatia's medical source statement indicates that alcohol and substance abuse did not contribute to plaintiff's impairments.  However, plaintiff told Dr. Bhatia that she had stopped using marijuana on a regular basis years earlier and that her alcohol intake was limited to a wine cooler once a week or every 2 weeks.  (Tr. 497).  This level of consumption is significantly lower that what plaintiff reported to Dr. Mades in 2009 and

-26-

during her hearing testimony.  Thus, it is reasonable to conclude that Dr. Bhatia did not know the full extent of plaintiff's substance use and thus could not properly factor its effects into her assessment.

The ALJ also stated that a physician may base an assessment of a patient's limitations on sympathy or a desire to avoid conflict.  (Tr. 29).  Standing on its own, an ALJ's speculation regarding a physician's motivation would not be a sufficient basis for discrediting a medical opinion.  Here, however, the ALJ properly cited inconsistencies between Dr. Bhatia's opinion and her own treatment notes and other medical evidence.  Thus, the ALJ did not err in declining to give Dr. Bhatia's opinion controlling weight.

Plaintiff argues that the ALJ should have recontacted Dr. Bhatia.  "An ALJ should recontact a treating or consulting physician if a critical issue is undeveloped." Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011).  However, a lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability.  Id. at 927.  The ALJ did not err in failing to recontact Dr. Bhatia.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of January, 2013.

-27-